HUEY & PHILP HARDWARE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 92801.   Promulgated October 24, 1939.

*Alvin H. Lane, Esq.*, for the petitioner.
*J. L. Backstrom, Esq.*, for the respondent.

## OPINION.

BLACK: The only issue involved in this proceeding is whether petitioner is entitled to a deduction for a bad debt which it alleges it ascertained to be worthless and charged off during the taxable year. There is no issue as to the amount of the debt or that it was charged off during the taxable year. Petitioner originally claimed $53,741.15 as the amount of the bad debt, but now concedes that this figure should be reduced to $49,504.72.

The respondent has denied the deduction on two grounds: First, that the purchase of the real estate at foreclosure sale by the hardware company and its subsequent transfer to two newly organized corporations, the Magna Realty Co. and Griffin Realty Co., was all part of a plan for the reorganization of the realty company and that all the above named corporations were parties to such reorganization and that petitioner is, therefore, not entitled to the deduction which it claims; second, that even if there were no reorganization of the realty company, nevertheless the fair market value of the property in question was far in excess of what petitioner paid for it at the foreclosure sale and petitioner, therefore, did not ascertain its debt against the realty company to be worthless, as it claims.

We shall take up respondent's first ground for disallowing the deduction. It is respondent's contention that petitioner sustained no loss within the purview of section 112 (b) (3) of the Revenue Act of 1934. It is respondent's contention that the $70,000 demand note executed by the Huey & Philp Realty Co. to petitioner (described in our findings of fact) was a "security" within the meaning of section 112 (b) (3) of the Revenue Act of 1934.

Section 112 (b) (3) of the Revenue Act of 1934 provides:

\* \* \* No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

The reorganization provisions of the Revenue Act of 1934 relied upon by the respondent are printed in the margin.[1]

The respondent cites the following authorities in support of his contention that there was a reorganization: *Burnham* v. *Commissioner*, 86 Fed. (2d) 776; certiorari denied, 300 U. S. 683; *Tiscornia* v. *Commissioner*, 95 Fed. (2d) 678, 682; *Commissioner* v. *Kitselman*, 89 Fed. (2d) 458; certiorari denied, 302 U. S. 709; *Commissioner* v. *Newberry Lumber Co.*, 94 Fed. (2d) 447; *Commissioner* v. *Freund*, 98 Fed. (2d) 201; *Karl B. Segall*, 38 B. T. A. 43; *E. P. Raymond*, 37 B. T. A. 423; *Frances M. Averill*, 37 B. T. A. 485. To these authorities may be added *Frederick L. Leckie*, 37 B. T. A. 252.

We shall not attempt to review each of the above authorities but we have read and carefully considered them. In substance they hold that, where the bondholders of a corporation which has defaulted in its bonds form a protective committee and agree upon a plan to purchase the property of the defaulting corporation at a foreclosure sale and transfer it to a new corporation organized as a part of the plan of reorganization, in exchange in whole or in part for the new corporation's stock or bonds or debentures, such transactions constitute a reorganization and gain or loss is to be recognized only to the extent provided in section 112.

---

[1] SEC. 112. (g) DEFINITION OF REORGANIZATION.—As used in this section and section 113—

(1) The term "reorganization" means \* \* \* (B) the acquisition by one corporation in exchange solely for all or a part of its voting stock: of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation; or of substantially all the properties of another corporation, or (C) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred. \* \* \*

(2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of a reorganization resulting from the acquisition by one corporation of stock or properties of another.

\* \* \* \* \* \* \*

(h) DEFINITION OF CONTROL.—As used in this section the term "control" means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

In the first place, we doubt if the $70,000 demand note of petitioner against the realty company dated June 10, 1934, secured by a second mortgage and foreclosed upon in November 1935, can be held to be a "security" within the meaning of section 112 (b) (3), cited above. Cf. *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462. *Marjorie Fleming Lloyd-Smith*, 40 B. T. A. 214.

But even if we assume that the $70,000 demand note in question was a "security" within the meaning of the quoted statute, in order for the transactions in question to be within the nonrecognition provisions of the statute in question, and the authorities above cited, petitioner must have purchased the property at foreclosure sale and transferred it to the newly organized corporations in exchange for their capital stock or securities, all as a part of a plan of reorganization previously agreed upon.

In the instant case there is no evidence of any plan to reorganize the realty company. On the contrary, certain of petitioner's officers who were in control of its affairs at the time of the foreclosure sale testified that there was no plan of reorganization; that the hardware company simply realized that it had a loss on the realty company and under the then set-up, the loss would in all probability continue to increase; and that the hardware company decided to foreclose its second lien and purchase the property at $20,000 if no one bid the property in at a higher price than that and take its loss by charging off the remainder of its debt as a bad debt. These officers testified that at the time of the foreclosure sale, there had been no plans made to organize two new corporations and transfer the purchased property to them; that these plans were agreed upon and consummated after the foreclosure sale.

There is no evidence in the record to the contrary, such as minutes of the corporations or letters to stockholders outlining a plan of reorganization. Therefore, we conclude from the evidence that the real estate in question was not purchased by petitioner at foreclosure sale as part of a plan to reorganize the realty company, but was simply a sale and must be so treated. As a further reason for coming to this conclusion, aside from the reasons which we have already stated, petitioner apparently did not exchange the property purchased at the foreclosure sale for the stock of the two newly organized corporations. Apparently each of these two newly organized corporations was organized with a capital stock of $1,000 paid in cash by petitioner.

Subsequently the real estate on which the Minnesota Mutual Life Insurance Co. held a first mortgage lien was conveyed to the Magna Realty Co. for $850 in cash and $9,150 deferred payments secured by a second mortgage and subject to the first mortgage held by the Minnesota Mutual Life Insurance Co. In the same manner and for

the same consideration, petitioner conveyed to the Griffin Realty Co. the real estate upon which the Praetorians held a first mortgage lien.

It is not necessary for us to decide whether the conveyance to the two newly organized corporations by petitioner of the real estate purchased by it at foreclosure sale was one in which gain or loss is recognized or is one in which gain or loss is postponed, either because of the reorganization provisions of section 112 of the Revenue Act of 1934 or of section 112 (b) (5) of the same act. Apparently there was neither gain nor loss to petitioner in these transactions with the two newly organized corporations in any event, because it appears to have conveyed the properties to the newly organized corporations for exactly what it paid for them at the foreclosure sale. But we have not that question before us.

As we have already stated, the only question which we have before us to decide is whether or not petitioner is entitled to the deduction of a debt which it alleges it ascertained to be worthless in the taxable year and charged off. In line with what we have said above, we hold that it is so entitled unless it is precluded from doing so by reason of the second reason assigned by the Commissioner in his deficiency notice.

The statute which authorizes a taxpayer to take a deduction for a debt ascertained to be worthless and charged off in the taxable year is section 23 (k) and is so familiar that it need not be quoted. Article 23 (k)-3 of Regulations 86, dealing with the phase of the question which we have here to decide, is in part printed in the margin.[2]

The petitioner contends that, under the doctrine promulgated by the Supreme Court of the United States in *Helvering* v. *Midland Mutual Life Insurance Co.*, 300 U. S. 216, the sale price at foreclosure is conclusive proof as to the fair market value of the property at the time of sale, and that no independent inquiry as to fair market value of the property at such time is permissible. We do not think the Supreme Court went as far in the *Midland Mutual Life Insurance Co.* case as petitioner contends, but we do not think it is necessary for us to decide how far it went in this respect.

---

[2] * * * If mortgaged or pledged property is lawfully sold (whether to the creditor or another purchaser) for less than the amount of the debt, and the mortgagee or pledgee ascertains that the portion of the indebtedness remaining unsatisfied after such sale is wholly or partially uncollectible, and charges it off, he may deduct such amount (to the extent that it constitutes capital or represents an item the income from which has been returned by him) as a bad debt for the taxable year in which it is ascertained to be wholly or partially worthless and charged off. In addition, if the creditor buys in the mortgaged or pledged property, loss or gain is realized measured by the difference between the amount of those obligations of the debtor which are applied to the purchase or bid price of the property (to the extent that such obligations constitute capital or represent an item the income from which has been returned by him) and the fair market value of the property. The fair market value of the property shall be presumed to be the amount for which it is bid in by the taxpayer in the absence of clear and convincing proof to the contrary. * * *

At the hearing, evidence was admitted from both parties as to the fair market value of the property in question. Upon a weighing of that evidence we have found that the fair market value of the property in question at the time of sale was the $20,000 which petitioner bid for it, plus the amounts of the outstanding first mortgages against it. We consider that it is unnecessary to discuss this evidence in detail. It is simply an ordinary instance where witnesses differ in their opinion as to value and it is unnecessary to believe that any of them testified in bad faith. We simply conclude that the usual presumption that the bid price at the duly advertised public sale represented the fair market value of the property at that time, coupled with petitioner's evidence at the hearing as to value, discharges its burden of proof in that respect and justifies our above finding as to its fair market value. Therefore, petitioner's basis for gain or loss on the future sale or exchange of the property was the purchase price paid for it at the foreclosure sale.

Petitioner will, of course, not be entitled to have any of the $49,-504.72 that is charged off as a bad debt carried forward as a part of its cost basis of the property, as would have been the case if we had held that the transactions showed a reorganization and petitioner could not take its bad debt deduction because of section 112 (b) (3). Petitioner is now getting a deduction for this $49,504.72 bad debt loss and as a matter of course can not use it as a part of the cost of the real property purchased at the foreclosure sale for the purpose of determining gain or loss or depreciation on the property in the future. We, therefore, hold that petitioner is entitled to a deduction of $49,504.72 as a debt ascertained to be worthless and charged off during the taxable year.

*Decision will be entered under Rule 50.*