WEST PRODUCTION COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 88997. Promulgated May 3, 1940.

*Robert Ash, Esq.,* and *J. A. Platt, Esq.,* for the petitioner.
*R. P. Hertzog, Esq.,* for the respondent.

1048

OPINION.

ARNOLD: The first issue involves the gain, if any, realized by petitioner on the Sterling note transaction. Respondent determined that petitioner first realized income upon the sale of the Moss Bluff property, and thereafter upon the purchase at foreclosure of the remaining collateral. Petitioner has advanced several theories with respect to the transaction, none of which are decisive of the question presented.

There is no dispute between the parties as to the amounts involved or the values used by each party in arriving at the various gains computed from the Sterling transaction. In arriving at the item of "realized discount" of $115,302.66 respondent treated the sale of the initial portion of the collateral as a separate transaction from the foreclosure within the taxable year on the remainder of the collateral by petitioner. In our opinion this was the initial error in respondent's determination. The entire transaction, i. e., the purchase of the notes, the sale of a portion of the collateral, and the acquisition of the remainder, all occurred within the taxable year 1932, and, as it was obviously a transaction entered into for profit by the petitioner, the gain or loss that finally materialized should govern the tax liability of the petitioner.

Ignoring the intermediate steps, which merely serve to cloud the issue, the essential factors may be summarized as follows: Petitioner purchased property (collaterally secured notes) for $324,039; it realized cash of $118,891.98 with the purchase; it sold a portion of the collateral (Moss Bluff properties) with the consent of the mortgagor, and received $165,000 of the sale price; and it reduced to possession by purchase at foreclosure sale the remaining collateral. It is agreed that the fair market value of the remaining collateral at the date of foreclosure sale was $101,522.77, which includes $9,534.59 balance realized from the sale of the Moss Bluff properties. The total cash and property received from the transaction by petitioner was $385,414.75; its cost basis was $324,039. Thus it appears that petitioner realized a gain on the transaction of $61,375.75.

In this view of the tax significance of the Sterling note transaction, it is immaterial whether J. M. West or petitioner was acting as agent

for Humble in the acquisition of the Moss Bluff Oil Field. In any event the net result of the entire transaction would be a $61,375.75 profit to petitioner. This result is forecast in petitioner's first theory, wherein it arrives at a net cost of the Sterling notes of $40,147.02 ($324,039 less $118,891.98, less $165,000). If petitioner had then taken into account the stipulated fair market value of the property acquired by the foreclosure sale on October 4, 1932, it would have arrived at the ultimate profit of $61,375.75.

One other contention of the petitioner merits comment, namely, that the foreclosure sale price represents the fair market value of the property. The Supreme Court's decision in *Helvering* v. *Midland Mutual Life Insurance Co.*, 300 U. S. 216, is cited in support of this contention. We can not agree. We have held, in *Huey & Philp Hardware Co.*, 40 B. T. A. 781, that the doctrine announced by the Supreme Court in the *Midland* case did not prohibit an independent inquiry as to the fair market value of the property at the time of the foreclosure sale. See also *Hadley Falls Trust Co.* v. *United States*, 110 Fed. (2d) 887. Obviously, we need make no independent inquiry here, as the parties themselves have stipulated the fair market value of the various properties. The decision in *Tiscornia* v. *Commissioner*, 95 Fed. (2d) 678, turned upon its own facts, and may be further distinguished by the absence of any evidence of fair market value other than the bid price at the foreclosure sale.

The second issue involves petitioner's right to a depletion deduction by virtue of the cash payment received from the transaction of March 23, 1932. (As used herein the term "cash payment" refers to petitioner's one-half interest.) In its return for the taxable year petitioner claimed a depletion deduction on the entire cash payment, which the respondent disallowed. Subsequently, however, respondent reversed his determination and ruled that $2,557,836.86 of the cash payment was subject to depletion, and $442,163.14 thereof was not subject to depletion.

Respondent's change in position grows out of his application of the principle announced in *Palmer* v. *Bender*, 287 U. S. 551, to a part of the leases transferred, and the application of the principle announced in *Commissioner* v. *Fleming*, 82 Fed. (2d) 324, to the remainder of the leases transferred. He apparently justifies his breakdown of the transfer into two separate transactions by the fact that the assignors retained different interests and rights of ownership in three of the leases from that retained in the other leases. Having broken the transaction down to the individual leases, respondent then allocated the cash payment among the leases upon the basis of the acreage involved.

In *Palmer* v. *Bender, supra*, the lessee of an oil and gas lease had explored and discovered oil on leased premises, which were then trans-

ferred by an assignment to a third party in consideration of a cash payment, a further payment to be made out of one-half of the first oil produced and saved, and a one-eighth overriding royalty. The Supreme Court allowed depletion upon each type of consideration, i. e., the cash payment or bonus, the oil payment or oil bonus, and the royalty payments. In its opinion the court pointed out that a taxpayer is entitled to a depletion allowance if by virtue of the leasing transaction he has retained a right to share in the oil produced. If he has such a right, he has an economic interest in the oil in place which is depleted by production. More specifically the Court stated that "When the two lessees transferred their operating rights to the two oil companies, whether they became technical sublessors or not, they retained, by their stipulations for royalties, an economic interest in the oil, in place, identical with that of a lessor."

The facts in the *Fleming* case, *supra*, are that Fleming owned an undivided interest in two oil and gas leases which he assigned for cash plus certain amounts payable out of a fractional part of the oil produced. The court denied depletion as to the cash payment but allowed depletion as to the payments from oil produced, upon the theory that part of the income resulted from a sale of a capital asset and part of it arose from the operation of the producing property in which Fleming had retained an economic interest.

In a more recent decision, *Helvering* v. *Elbe Oil Land Development Co.*, 303 U. S. 372, the Supreme Court pointed out that a conveyance of oil and gas properties for cash and deferred payments aggregating $2,000,000 was an absolute sale, even though under certain conditions the vendor would be entitled to receive one-third of the net profits resulting from production and operation. The Court pointed out that gross income from the property as used in the statute governing the allowance of depletion meant gross income received from the operation of the oil and gas wells by one who has a capital investment therein, and accordingly it denied percentage depletion to the vendor then before the Court because it had retained no investment in the properties assigned. A similar lack of investment in the mineral deposit caused the Supreme Court to deny depletion deductions to a processor who had contracted for casinghead gas, *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362; and to a stockholder of a corporation that owned oil and gas in place, *Helvering* v. *O'Donnell*, 303 U. S. 370. See also *Blankenship* v. *United States*, 95 Fed. (2d) 507.

Factually, the *Fleming* case, *supra*, represents a hybrid of the situations that existed in *Palmer* v. *Bender*, *supra*, and *Helvering* v. *Elbe Oil Land Development Co.*, case, *supra*, in that Fleming sold a part of his interest and retained a part. The decided cases hold that where this situation exists the assignor has retained such an

economic interest in the mineral deposit that production will deplete his investment, and accordingly the assignor has been allowed depletion on the gross income from the part retained, but has been denied depletion on the cash payment. *Laird* v. *Commissioner*, 97 Fed. (2d) 730, affirming 35 B. T. A. 75; *Columbia Oil & Gas Co.*, 41 B. T. A. 38; *Hammonds* v. *Commissioner*, 106 Fed. (2d) 420. Cf. *Thomas* v. *Perkins*, 301 U. S. 655, which involved the depletion allowable to the assignee.

The facts in this proceeding are both like and unlike the *Fleming* case. The leases here were disposed of as a unit or block, and there is no suggestion in the testimony or the documentary evidence that any segregation of leases was contemplated by the parties to the transaction. The transfer subjected all the leases equally to the charge of $17,000,000 to be paid out of production and the reservation by the assignors as to this payment applied to all leases equally. By the trade a five-sixths interest in the undivided half was transferred to Humble in all the leases. Petitioner and Cullen retained for themselves an undivided $\frac{1}{48}$ in all leases except three, namely, the two Wolters' leases and the A. P. George 200-acre lease. The $\frac{1}{48}$ interest in these leases had been disposed of by the assignors prior to the transfer to Humble, or had been reserved by the transferor of the assignors.

In this situation one of the questions which we are asked to decide is whether the interest in the $17,000,000 oil payment is sufficient to entitle petitioner to deplete the portion of the cash payment attributable to the three leases. Another question which the issue suggests is whether the cash payment should be considered as applicable to the entire property, disposed of as a unit, and the separate nature of the leases ignored. If the property be treated as a unit rather than as separate leases making up the unit, then there would be a clear, decisive parallel with the facts in the *Palmer* case, *supra*, and petitioner would be entitled to deplete the entire cash payment. If the property can be broken down, and the separate leases individually considered, then the *Fleming* case, *supra*, is parallel with respect to three of the leases. In the last analysis, therefore, we must decide whether one property was transferred, or several properties were grouped and transferred as a unit.

Our examination of the agreement of March 23, 1932, together with the other documentary evidence of record, and the testimony of the several witnesses, convinces us that to subdivide this agreement into as many separate agreements as there were leases forming the Thompson field is without justification. The transaction with Humble and the negotiations leading up to the transfer were all premised upon the assignment of five-sixths of petitioner's interest in a producing oil field. Such an assignment in our opinion, should

be viewed broadly, and not narrowly or technically. When so viewed the transfer is comparable to *Palmer* v. *Bender*, *supra*, in that the petitioner assigned five-sixths of its interest in a producing oil field for cash, future payments to be made out of production, and retained royalties.

That the transfer here was a "leasing transaction" is demonstrated by the various limitations placed upon the assignee's use of the property. Humble had no right to release or reassign the leases to the original lessors without the consent of its assignors. Humble did have the right, however, at any time, to reassign all the leases to its assignors, and thereupon relieve itself of any further obligation or liability to its assignors with respect to said leases and under the contract. Humble likewise had the right at any time to surrender any one or more of said leases, or any portion of the acreage included therein, provided, however, it gave written notice to its assignors of its intention and if so requested it was to execute and deliver the said lease or leases or acreage to its assignors, in which event Humble would be relieved from any liability with respect to the lease, leases, or acreage surrendered. The leasing character of the transaction is further shown by the obligation imposed upon Humble to produce a minimum of 15,000 barrels of oil daily, a provision solely for the benefit of its assignors, which was no part of the original leases, and also by the assignors' right to inspect Humble's books and records relating to production in the Thompson field, by the assignor's right to witness gauges of production, and by their right to receive logs of all wells drilled or drilling and samples of cores and cuttings from wells drilled or drilling by the assignee. Each of these provisions connotes a lease rather than a sale.

However we view the situation, we fail to see any sound basis for subdividing the assignment into the separate leases composing the Thompson field and an attempt to make an allocation based on average acre value, as the Commissioner has done. The Commissioner in his allocation treats each acre included in the transfer as of equal value. Some of the acreage was shown by wells drilled to be very productive, with much greater thickness of producing sand than others. Some of the more remote wells produced water and showed the producing sand to be thinning out and much less productive, while the greater portion of the acreage was untested and its value was then more or less speculative and could not be determined with a sufficient degree of accuracy on which to make a valuation allocation. Necessarily producing acreage is more valuable than acreage without production and remote from producing wells. Under these circumstances we would not be justified in approving any allocation based on equal valuation of the acreage included in the transfer.

*Decision will be rendered under Rule 50.*