Aaron W. Hardwick v. Commissioner. Arthur F. Morton v. Commissioner. William J. Gibbons v. Commissioner.
Aaron W. Hardwick v. Commissioner
Docket Nos. 5388, 5389, 5390.
United States Tax Court
1947 Tax Ct. Memo LEXIS 279; 6 T.C.M. (CCH) 261; T.C.M. (RIA) 47060; March 6, 1947
*279 Sanford D. Beecher, Esq., 1617 Land Title Bldg., Philadelphia, Pa., for the petitioners. William H. Best, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined deficiencies in income tax for the calendar year 1939 as follows: Docket No.
Deficiency
Aaron W. Hardwick
5388
$3,098.90
Arthur F. Morton
5389
2,492.46
William J. Gibbons
5390
2,585.61
The determinations of the respondent are that petitioners realized gain upon the application of mortgage debentures to the purchase price of foreclosed realty, and that the fair market value of the realty exceeded the cost basis of the mortgage debentures and the cash used in the transaction. From these determinations, respondent has determined that the gain realized amounted to $33,215.75, and each petitioner has been held to be taxable upon one-third of that amount, each having had a one-third interest in the property and in the transaction. There is one general issue, whether the determinations of the respondent are correct. Petitioners filed their returns with the collector for the first district of Pennsylvania. Findings of Fact
*280 Some facts have been stipulated. The stipulation is incorporated herein by reference as part of the findings of fact. On or about September 13, 1939, petitioner acquired mortgage bonds secured by separate mortgages on five apartment house buildings and the realty located on one block on Pine Street, between 48th and 49th Streets, Philadelphia. The buildings are known as Kent, Delmar, DeLuxe, Cecile, and Lafayette apartments. They were built at about the same time in 1922; each is of the same size and construction; and each contained nine apartments. E. G. Crockett, a rental agent, building manager, and real estate broker, was made managing agent of Delmar Apartments in 1937. He developed a plan for the economical management of the five apartment buildings which required single ownership of the five buildings. He interested petitioners in his plan. Aaron W. Hardwick and William J. Gibbons were engaged in the textile business, and Arthur F. Morton was an accountant. The circumstances under which petitioners acquired the mortgage bonds of each apartment property are as follows: Each of the apartment properties were mortgaged to secure mortgage bonds held by the Philadelphia *281 Company for Guaranteeing Mortgages, hereinafter referred to as Philadelphia Company. Philadelphia Company executed five declarations of trust under which it was trustee of the indentures of mortgage and the bonds thereby secured. It sold to the public certificates of interest in the bonds and mortgages held in trust. The mortgage on each building was about $40,000. The certificates, or participating bonds sold to the public were usually in the face amount of $500. Philadelphia Company guaranteed payment of the participating bonds. Philadelphia Company went into receivership, and on January 11, 1933, the United States District Court for the Eastern District of Pennsylvania, appointed receivers in equity for Philadelphia Company. It resigned as trustee of the above described mortgage indentures, and successor corporate trustees were appointed. In connection with the receivership of Philadelphia Company, a bondholders General Committee was formed for the protection of all holders of mortgages and bonds guaranteed by Philadelphia Company, and about 14,000 bondholders deposited their bonds with the Committee. These bonds represented approximately two-thirds in value of the bonds secured *282 by the mortgages on the five apartment buildings. The Committee was authorized to act for the bondholders under an agreement. Among other things, it received offers to purchase bonds, and it made arrangements to sell the bonds if acceptable offers were received. After Crockett, the real estate broker, obtained the agreement of petitioners to inquire into the matter of purchasing the five apartment properties involved here, Crockett began negotiations with B. H. Cooper, vice-chairman and executive officer of the Bondholders' Committee. Crockett was advised that the Committee could not sell the apartment houses directly, but that they could be acquired by the purchase of a sufficient number of mortgage bonds and the foreclosure of the existing mortgages. Petitioners were satisfied to acquire the properties in this manner, and they authorized Crockett to make the necessary arrangements. Petitioners were to advance the funds necessary to acquire the properties. In payment for Crockett's services, petitioners agreed that after the apartment houses were acquired, Crockett would operate them at the customary management fee. Petitioners also agreed that a corporation would be formed to *283 take title to the properties. Crockett was to receive a 25 per cent interest in the corporation after repayment to petitioners of the money they advanced to purchase the apartment houses. On March 10, 1938, Crockett applied to the New York Life Insurance Company for a first mortgage of $17,500 on each of the buildings. Each application stated that: The property is at present encumbered by a $40,000 first mortgage given to the Philadelphia Company for Guaranteeing Mortgages. The said Philadelphia Company for Guaranteeing Mortgages is bankrupt and the ownership of the bonds secured by the above mortgage is vested in sundry hands. The undersigned represents interests which have arranged to obtain control of the outstanding bonds. The existing mortgage has not been foreclosed and the property is being operated by the Substituted Trustee as Mortgagee in Possession. Upon receipt of a mortgage committment [sic] from the New York Life Insurance Company, binding thereon for a period of ninety days, foreclosure action will be instigated and upon receipt of the Title the mortgage applied for herein will be given. On April 15, 1938, the New York Life Insurance Company authorized the mortgage *284 loan of $17,500 on each of the five apartment buildings. Thereafter petitioners made arrangements with the Frankford Trust Company to borrow sufficient funds to purchase the mortgage bonds held by the Bondholders Committee and to foreclose the mortgages. By letter dated June 2, 1938, the Frankford Trust Company informed Morton that: As we advised you by telephone several days ago our Board approved a loan of $90,000.00 to be secured by a note or notes aggregating $90,000.00 jointly executed by yourself, Aaron Hardwick, and William Gibbons, as collateral security for said note we are to receive sufficient of the outstanding first mortgage bonds of the Kent Apartments. 4807-11 Pine St., Del-Mar Apartments, 4815-17 Pine Street, Deluxe Apartments, 4819-23 Pine Street, Cecile Apartments, 4833-37 Pine Street, Lafayette Apartments, 4845-49 Pine Street, for you to controll [sic] the foreclosure of the said mortgages on said properties. We are also to receive the commitments of the New York Life Insurance Company to place permanent mortgages on said properties in the amount of $17,500.00 each after foreclosure the proceeds of which will be used to repay or reduce your note or notes. *285 The title policy of the Frankford Trust Company to accompany said mortgages. On May 25, 1938, Crckett submitted a written offer to the Bondholders Committee for the purchase of the mortgage bonds which were outstanding against the five properties which petitioners desired to acquire. The offer specified that petitioners would pay the following amount for each $500 bond: Per bond
Lafayette $226
DeLuxe
127
Delmar
263
Cecile
140
Kent
180
The offer was conditioned on the acceptance of not less than an aggregate of $163,800 in face amount of all of the bonds above mentioned, and on the acceptance of not less than the following minimum face amount of each issue: Lafayette
$38,500
DeLuxe
36,000
Delmar
25,500
Cecile
34,000
Kent
29,800
On July 22, 1938, the offer was accepted by the General Committee on behalf of the bondholders. By September 13, 1938, petitioners acquired the following bonds at a total cost of $65,817.75: Face Amount
Total
Acquired by
Cost to
Premises
Bond Issue
Unsubordinated
Petitioners
Petitioners
Kent
$40,000
$35,000
$29,500
$10,620.00
Delmar
40,000
30,000
27,500
14,464.75
DeLuxe
42,000
42,000
39,500
10,033.00
Cecile
40,000
40,000
37,000
10,360.00
Lafayette
45,000
45,000
45,000
20,340.00
Total
$65,817.75
*286 The money used by petitioners to purchase the bonds was borrowed from the Frankford Trust Company. Pursuant to the financial arrangements made by petitioners with the Frankford Trust Company, title to the bonds was taken in the name of the Frankford Trust Company as collateral security for petitioners' joint promissory notes held by it. On August 9, 1938, within three weeks after most of the bonds were purchased, the Frankford Trust Company instructed the trustees of the mortgages on the Kent, DeLuxe, and Lafayette apartment houses to institute foreclosure proceedings pursuant to the terms of the trust mortgages. On October 9, 1938, and January 3, 1939, the Frankford Trust Company instructed the respective trustees of the mortgages on the Cecile and Delmar apartment houses to institute forclosure proceedings. In directing the trustees to proceed with foreclosure and sale, the Frankford Trust Company was acting for and on behalf of petitioners. By July 28, 1939, title to all five of the apartment houses was vested in petitioners or their nominee. The manner in which petitioners acquired title to each of the five apartment houses varied somewhat because of the slight differences *287 in procedure adopted under the respective trust mortgages. However, the factual differences are insignificant, and the steps taken with respect to the acquisition of the DeLuxe Apartments, as explained hereinafter, are typical of what took place upon the foreclosure of the mortgages on the other apartment buildings: On August 9, 1938, the Frankford Trust Company, as holder of $37,000 out of a total of $42,000 face amount of bonds secured by a mortgage on the DeLuxe Apartments, instructed the trustee under the mortgage to institute foreclosure proceedings and sell the premises at public sale. The bonds and mortgages were then in default and the mortgage provided that under such circumstances the holders of more than 25 per cent of the bonds could demand that the trustee commence foreclosure proceedings. On October 18, 1938, the trustee filed its bill of complaint in foreclosure against the mortgagor and real owner. On December 9, 1938, the court entered its final decree of foreclosure and authorized public sale of the premises. The decree provided in part: 15. The balance of the purchase price hereinabove not required to be paid in cash, may be paid in cash, or the purchaser *288 may satisfy and make good the balance of his bid in whole or in part by turning in to be paid and cancelled or to have payment on account credited thereon, bonds secured by said Trust Mortgage. Such bonds used in part payment of said purchase price shall be received at such price or value as shall be equivalent to the sum which would be payable thereon out of the net proceeds of the said sale, if paid in money to the holder of such bond for his just share and proportion of such proceeds. The purchaser shall be credited with said bonds on account of the purchase price accordingly. The public sale was held on December 27, 1938. At the sale the Frankford Trust Company, acting for and on behalf of petitioners, submitted the highest bid in the sum of $20,552.65. On December 30, 1938, the court approved the sale to the Frankford Trust Company. Thereafter the Frankford Trust Company assigned its bid to Roy M. Kaller, an employee of petitioner Morton, who was acting for the petitioners. Settlement for the sale was made on January 20, 1939. Petitioners' nominee turned over $8,770.38 in cash and $39,050 face amount of bonds in payment of the bid price of $20,552.65. The bonds had cost *289 petitioners $10,033, for which they received a credit of $11,504.77 [1] on the bid price. By deed dated January 30, 1939, the DeLuxe Apartments were conveyed to Kaller. On the same day Kaller conveyed the premises to the Gibwick Realty Corporation, a corporation formed by petitioners, as will be described hereinafter. The conveyance to the Gibwick Realty Corporation was subject to a first mortgage held by the New York Life Insurance Company in the amount of $17,500. The $17,500 received from the New York Life Insurance Company, for which the mortgage had been given, was paid to the Frankford Trust Company in accordance with its agreement with petitioners. The Frankford Trust Company credited this amount in part payment of the indebtedness owing to it by petitioners for the money borrowed to finance the purchase of the bonds and foreclosure proceedings. Petitioners acquired the other four apartment properties in substantially the same manner as they acquired the DeLuxe Apartments. With respect to the Kent and Lafayette apartment *290 properties, petitioners or their nominee, in accordance with the procedures set forth in the respective trust mortgages, did not buy in the properties at the foreclosure sales. The respective trustees under the mortgages, upon instruction by petitioners, foreclosed the properties and bought in the properties at nominal amounts, holding the properties in trust for the bondholders. Thereafter the trustees sold the properties to petitioners upon approval by the court. The bid price of the properties on foreclosure, the purchase price paid by petitioner for the properties, the amount of credit given against the bid or purchase price on account of bonds deposited by petitioners, and the cost of the bonds to petitioners were as follows: Bid Price on
Credit for
Actual Cost
Foreclosure
Purchase Price
Bonds Deposited
of Bonds
Kent
$ 3,890.00
$20,500.00
$12,306.72
$10,620.00
Delmar
15,000.00
15,000.00
12,793.67
14,464.75
DeLuxe
20,552.65
20,552.65
11,504.77
10,033.00
Cecile
15,100.00
15,100.00
8,787.37
10,360.00
Lafayette
200.00
20,340.00
20,340.00
20,340.00
Total
$54,742.65
$91,492.65
$65,732.53
$65,817.75
The total cost *291 of the five apartment properties to petitioners was $91,784.25. This comprised $65,817.75 originally expended to purchase the mortgage bonds and additional cash of $25,966.50 needed to actually acquire the premises on or after the foreclosure sales. The foreclosure sales of the Kent, Delmar and Cecile apartment properties, and the deeds conveying these properties to petitioners took place and were made in 1939. The foreclosure sale of the DeLuxe Apartment took place on December 27, 1938; the court approved the sale on December 30, 1938, and settlement for the sale was made on January 20, 1939. The Lafayette Apartments were sold on foreclosure on December 5, 1938. The sheriff's deed to the trustee was made on January 9, 1939, and the conveyance of the property to petitioners was made by deed dated January 30, 1939. As soon as each apartment building was acquired petitioners placed a $17,500 mortgage thereon with the New York Life Insurance Company. The proceeds of the loans were turned over to the Frankford Trust Company in payment of the indebtedness owing to it by petitioners. On February 9, 1939, petitioners organized the Gibwick Realty Corporation to take title to the five *292 apartment houses. Each petitioner and Crockett paid $125 into the treasury of the corporation. Certificates for 25 shares of stock were issued to petitioners and Crockett. These 100 shares represent the total amount of stock issued and outstanding. Title to the five apartment houses is now vested in the Gibwick Realty Corporation. As each apartment house was transferred to the corporation, the accounts of petitioners were each credited with equal amounts representing the cash advanced by them in the acquisition of the properties. As of January 31, 1940, the close of the first fiscal year of the corporation, and after all the properties had been transferred to the corporation, the total amount thus credited to petitioners on account of cash advanced by them in the acquisition of the properties was $9,784.94. One-third of this $9,784.94 was credited to the account of each petitioner as a liability owing to him and for which he was a creditor of the corporation. Since Crockett advanced no money for the acquisition of the properties, no amount was credited as a liability owing to him on the books of the corporation. For the year 1937, the gross rents of each apartment property and *293 the net income after operating expenses, taxes and other charges were as follows: Gross Rents
Net Income
Kent
$4,957
$ 138
Delmar
4,828
(138)* Loss
DeLuxe
5,555
1,219
Cecile
4,876
128
Lafayette
5,523
694
Prior to 1939, each of the five properties had been allowed to go without repairs and up-keep so that in 1939 all of the properties were in need of substantial repairs. The fair market value of each of the apartment properties known as Kent, Delmar, Cecile and Lafayette, on the respective acquisition dates in 1939 was $20,500. The fair market value of the property known as DeLuxe on the date of acquisition in 1939 was $20,552.65. Opinion Petitioners have treated the transaction whereby they acquired the five apartment properties as one involving merely the purchase of the properties. Their income tax returns did not report the transaction as one giving rise to any gain or loss for tax purposes in 1939. The respondent determined that the application of the mortgage debentures to the bid or purchase price of each property represented a closed transaction upon which gain or loss had to be recognized in 1939. He determined that the fair market *294 value of the properties acquired was $125,000, and that since the cost of the debentures and the cash expended was $91,784.25, the petitioners realized a short term capital gain in the amount of $33,215.75. Respondent contends that petitioners stood in the same position as the "creditor" of a mortgagor referred to in section 19.23 (k)-3 of Regulations 103, [2] and that when they applied the mortgage debentures to the purchase or bid price, gain or loss was realized. Respondent relies upon his regulation and contends that it is applicable here. Respondent contends, also, that the fair market value of each property on the acquisition date was $25,000, so that gain on each property was realized in the respective amounts which are shown in the schedule set forth in the margin. [3]
*295 Petitioners contend that the regulation which respondent relies upon is not applicable to their transaction. They do not question the validity of the regulation itself. They argue, rather, that the regulation applies only where the original bondholders foreclose and buy the property, and that it should not apply where a taxpayer acquires mortgage bonds simply as a step in acquiring the mortgaged properties securing the bonds, and under such circumstances applies them to the bid or purchase price of the properties. In short, petitioners take the position that there was but one transaction, the purchase of the mortgaged properties, and that no gain or loss for tax purposes arises until the properties are eventually resold. Under this view, the acquisition of the bonds was merely a step towards acquiring the properties and no gain or loss was realized upon disposing of the bonds in partial satisfaction of the purchase of the properties under foreclosure. The contention of petitioners, if approved, would give rise to an exception to the regulation in question. We are unable to find anything in the circumstances and facts of this case which would provide a sound basis for such exception. *296 There is little of substance in the argument of the petitioners. They purchased the bonds in arm's length dealings. They applied the bonds to the bid or purchase price under foreclosures. They voluntarily chose a course which comes squarely within the scope of the regulations. Having adopted a particular course as a means to an end, they must accept the tax consequences of that course, and it is immaterial that the same end could have been achieved through adoption of some other course of procedure. As was said in Bonham v. Commissioner, 89 Fed. (2d) 725, 728, "* * *, where the choice of ways makes a difference in application and effect of the tax statutes, the taxpayer must be held to the way and status he voluntarily created as is likewise the Government." The regulation in question treats as an "identifiable event" or closed transaction giving rise to gain or loss which is recognized for tax purposes, the exchange of mortgage obligations for the mortgaged property. See Elverson Corporation v. Helvering, 122 Fed. (2d) 295, 297, where it is said that "Whenever anyone surrenders a thing of value for another thing of value, the surrender will for tax purposes *297 ordinarily close the transaction by which he acquired the thing surrendered, and normally he will 'realize' a gain or loss." The regulation has been in effect without any substantial change over a long period, and as an interpretation of a provision of the revenue laws it is deemed to have received legislative approval by virtue of reenactment of the statutory provision it has interpreted. See Hadley Falls Trust Co. v. United States, 110 Fed. (2d) 887, 891. Since the facts in this case are that the bonds were applied in the purchase of the properties under foreclosures, the question presented is clearly covered by the regulation, and we must reject the contention of the petitioners. It is held that the application of the bonds to the bid or purchase prices of the mortgaged properties by the petitioners in the purchase of the mortgaged properties constituted a transaction which gave rise to gain or loss in 1939. The determination of the respondent to that effect is sustained. The next question is whether gains were realized and the amounts thereof. The aggregate of the bid or purchase prices was $91,492.65. The pertinent regulation provides that "The fair market value *298 of the property shall be presumed to be the amount for which it is bid in by the taxpayer in the absence of clear and convincing proof to the contrary." Under this question, petitioners contend that the purchase or bid prices represent the fair market values of the properties and that since the credit given for the bonds deposited was $85.22 less than the cost of the bonds to the petitioners, no gain was realized. The purchase or bid price of each property is set forth below. [4]
Respondent contends that the amounts for which the properties were bid in or purchased did not represent the fair market values of the properties. He points out, inter alia, that all of the five buildings were built by the same builder at the same time; that they were of similar construction and design; that they were placed upon land of approximately *299 equal value; and that the petitioners acquired title to each property at foreclosure sales at about the same time; but that the purchase or bid prices of each property were not the same. These facts show, argues the respondent, that there was no relationship between the amounts which were bid and the fair market values. It is permissible to make independent inquiry as to the fair market value of property at the time of a foreclosure sale. See West Production Co., 41 B.T.A. 1043, 1050; aff'd, 121 Fed. (2d) 9; Huey & Philp Hardware Co., 40 B.T.A. 781; Hadley Falls Trust Co. v. United States, supra. Careful consideration has been given to the evidence submitted by petitioners and by respondent on the question of the fair market value of each property. The evidence under this issue includes evidence relating to sales of comparable properties at or about the crucial dates; the condition of the properties at the crucial dates; and the opinions of expert witnesses which were called by both parties. It is our conclusion from consideration of all of the evidence that each property, on the date of acquisition, had a fair market value of *300 $20,500, with the exception of the property called "DeLuxe," and that the fair market value of the DeLuxe property was $20,552.65. We have so found in the findings of fact. Petitioners, on brief, did not present any argument relating to an allegation made in the amended petition that the Lafayette and DeLuxe properties were acquired prior to January 1, 1939. We understand that they have abandoned that contention. Decisions will be entered under Rule 50. Footnotes
1. The minor discrepancy between the amount of credit, cash and bid price apparently results from capital adjustments subsequent to the settlement.↩
2. SEC. 19.23(k)-3 [Regulations 103], as amended by T.D. 5234↩. Uncollectible deficiency upon sale of mortgaged or pledged property. - * * * In addition, if the creditor buys in the mortgaged or pledged property, loss or gain is realized measured by the difference between the amount of those obligations of the debtor which are applied to the purchase or bid price of the property (to the extent that such obligations constitute capital or represent an item the income from which has been returned by him) and the fair market value of the property. The fair market value of the property shall be presumed to be the amount for which it is bid in by the taxpayer in the absence of clear and convincing proof to the contrary. If the creditor subsequently sells the property so acquired, the basis for determining gain or loss is the fair market value of the property at the date of acquisition. * * * 3. ↩
Fair Market
Bonds and
Property
Value Determined
Cash Paid
Gain
Kent
$25,000
$18,347.38
$ 6,652.62
Delmar
25,000
16,540.31
8,459.69
DeLuxe
25,000
19,797.30
5,202.70
Cecile
25,000
17,564.38
7,435.62
Lafayette
25,000
19,534.88
5,465.12
Total Gain
$33,215.75
4. ↩
Fair Market
Value Determined
Bonds and
Purchase or
Property
by Respondent
Cash Paid
Bid Price
Kent
$ 25,000
$18,347.38
$20,500.00
Delmar
25,000
16,540.31
15,000.00
DeLuxe
25,000
19,797.30
20,552.65
Cecile
25,000
17,564.38
15,100.00
Lafayette
25,000
19,534.88
20,340.00
Total
$125,000
$91,784.25
$91,492.65